NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-1061

STATE IN THE INTEREST OF J.D.B.

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 22,546
HONORABLE RONALD F. WARE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, James T. Genovese, and David E. Chatelain,[*]
Judges.

AFFIRMED AND REMANDED WITH INSTRUCTIONS.

**John Foster DeRosier**
**District Attorney**
**Carla S. Sigler**
**Assistant District Attorney**
**Fourteenth Judicial District**
**1020 Ryan Street**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

---

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Annette Roach**
**Louisiana Appellate Project**
**P.O. Box 1747**
**Lake Charles, LA 70602**
**(337) 436-3384**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **J.D.B.**

PETERS, J.

J.D.B.,[1] a juvenile, appeals his adjudication as a delinquent for having committed sexual battery as defined in La.R.S. 14:43.1. In his single assignment of error, he asserts that the evidence submitted in his case was insufficient to establish all of the elements of the offense of sexual battery beyond a reasonable doubt. For the following reasons, we affirm J.D.B.'s adjudication of delinquency and remand the matter to the juvenile court with instructions to advise J.D.B. of the provisions of La.Code Crim.P. art. 930.8.

## DISCUSSION OF THE RECORD

On July 14, 2009, the State of Louisiana (state) filed a petition seeking to have J.D.B. (hereinafter sometimes referred to as "the juvenile") adjudicated a delinquent. The petition asserted that between February 2, 2008, and November 9, 2008, the juvenile committed three different acts that would justify him being adjudicated a delinquent: (1) aggravated rape as defined in La.R.S. 14:42(A)(4), (2) indecent behavior with a juvenile as defined in La.R.S. 14:81, and (3) sexual battery as defined in La.R.S. 14:43.1. After trial, the juvenile court found that the state failed to produce sufficient evidence to support the first two charges, but concluded that the state had established beyond a reasonable doubt that the juvenile had committed an act of sexual battery. Based on this conclusion, the juvenile court adjudicated the juvenile to be a delinquent. Subsequently, the juvenile court entered a disposition of the case, placing the juvenile on probation for a period not to exceed his eighteenth birthday and caused the probation to be subject to special conditions. In this appeal, the juvenile questions only the adjudication.

---

[1] Initials will be used to identify the parties pursuant to La.Ch.Code art. 412 and La.R.S. 46:1844(W).

The record reflects that the juvenile was born on September 5, 1994. Therefore, he was fourteen or fifteen years old at the time of the charged delinquent acts, depending on when in the time period at issue the offense occurred. The victim, J.N.M. (hereinafter, and for clarity of the record, J.N.M. will sometimes be referred to only as "the victim"), was born on February 8, 2002, and was, therefore, six years old at the time of the alleged delinquent act. The juvenile and the victim lived in the same immediate neighborhood at the time of the charged delinquent acts, and, despite the significant age difference, they often played together with their siblings.[2]

The primary evidence against J.D.B. was supplied by the testimony of J.N.M. According to J.N.M., the juvenile had a history of unwanted attention toward her, and, when they were alone, the juvenile's attention became physical. As an example of this behavior, the victim related one instance when the neighborhood children were riding their bikes. According to J.N.M., J.D.B. took her into the backyard and kissed her forehead, lips, and cheeks. She could not even hide during the times when the children played hide and seek without J.D.B. following her.

With regard to the charges now before this court, J.N.M. testified that on different occasions, J.D.B. caused her to lick his "private part," and he licked and kissed her "private part;" bumped her against his "private part" as he was holding her from behind; and "stuck his private part in [her] butt."[3] On each occasion, according to J.N.M., J.D.B. told her not to tell anyone what he had done.

J.D.B.'s inappropriate behavior was ultimately called to the attention of J.N.M.'s mother, L.B., in early November of 2008, when J.N.M.'s older brother

---

[2]J.D.B. has two sisters, N.D. and J.D., while J.N.M. has one brother, J.P.M. All are juveniles.

[3]Other evidence in the record makes it clear that when describing this activity, J.N.M. was referencing the sexual organs of the male and female.

overheard his sister state that J.D.B. had kissed her. L.B. testified that when she confronted her daughter on November 10, 2008, J.N.M. began to cry and told her that:

> [J.D.B.] was swinging her around in the back yard, kissing her on her lips and her forehead, kissed her private part, made her kiss his, stuck his hand in her pants, bent her over and tried to stick his private part or pushed his private part against her, her behind. And that's why she stated her butt would itch sometimes because of that. And he told her not to tell anyone because they would get in trouble.

According to L.B., her daughter's tears were because she thought she was going to be in trouble for allowing the activity to occur. Unfortunately, J.N.M. could not provide her mother with any specific dates or date references for the inappropriate behavior.

L.B. immediately telephoned the Lake Charles City Police and reported what J.N.M. had told her. Lake Charles Police Officers Timothy Milburn and Jason Dereese initially responded to L.B.'s telephone call, but after talking with L.B., concluded that this was a sex offense requiring the services of someone in the department's Sex Crimes Division. Officer Milburn contacted Detective Takisha Robertson, of the Sex Crimes Division, who arrived at the scene and took over the investigation. Neither Officer Milburn nor Officer Dereese talked to J.N.M. before Detective Robertson's arrival.[4]

Detective Robertson testified that based on the information supplied to her at the scene,[5] she did not recommend a sexual assault examination because there was no

---

[4]Officer Milburn testified that department protocol prevented him from speaking with a child victim of sexual assault unless an emergency existed, and no emergency existed in this case because the incidents had not occurred in the immediate past.

[5]In addition to speaking with the detective, L.B. provided the detective with the handwritten notes that she had taken during her discussion with her daughter. These notes were offered into evidence at trial and read as follows:

concrete date for the offenses, and sexual assault examinations are only performed if the conduct at issue occurred within seventy-two hours prior to receiving the report. Detective Robertson then made arrangements for J.N.M. to be interviewed at the local Children's Advocacy Center.

J.N.M.'s initial interview with Erica Simon, a forensic interviewer with the Children's Advocacy Center, occurred on November 13, 2008. A video tape of that interview was introduced into evidence. We partially summarize the content of the interview as follows:

> J.N.M. stated she was six years old, was in the first grade, and lived with her parents and one of her brothers. She told the interviewer that her parents had brought her to the Child Advocacy Center so she could talk about what the Juvenile did. J.N.M. said the Juvenile chased her to kiss her on her lips, cheeks, and forehead. This made her feel sad because it was only okay for family to kiss her. The Juvenile asked her if she liked it, and she told him, "no." J.N.M. related that the Juvenile had taken her into his room when no one else was home. J.N.M. explained that the Juvenile would take her into his yard to kiss her. This happened more than one time, and the first time happened halfway to his birthday. On that occasion the Juvenile kept asking while they were playing, and J.N.M. kept saying no. J.N.M. did not want to get into trouble. J.N.M. added that the Juvenile had used his hand to touch her middle spot while they were in his front yard. Again, the Juvenile asked if she liked it, and J.N.M. replied, "no." The contact was on top of her clothing. J.N.M. further alleged that the Juvenile had taken her either from or into the backyard and kissed her when she was playing with her friends. On that occasion, the Juvenile's uncle and mother were standing by the garage, but they did not see. J.N.M. then said the adults were in the back, and the Juvenile took her to the front. J.N.M. next declared that the Juvenile had stuck his private spot in her butt while they were in his room. This happened on the same day she had been playing school in his back yard. The Juvenile brought her inside and put his private spot in her butt. Gesturing to her crotch, J.N.M. said she saw

---

Kissed me on my lips[,] touched me on my middle spot[,] touched me on my butt[,] tr[i]ed to pull my pants down[,] swung me around. Asked him to put me down[,] asked me to give him a kiss [in the] shedd [sic]. [N]obody in yard. [The Juvenile] showed me his middle, made me kiss his middle spot[,] he pushed me to kiss. Put his hands in my pants. Kissed me on my middle spot. He told me don[']t tell anybody[,] so I want [sic] get in trouble[,] & he want [sic] get in trouble[,] too. For his Bday[,] he did the same thing. [D]ug in my butt. Put private part in my butt, that[']s why it hurt.

4

his middle spot. J.N.M. said the Juvenile made her pants sag. She told him to stop, but he did not listen. J.N.M. explained that the Juvenile stuck out his middle spot like how boys pee. J.N.M. said for the Juvenile to stop, but he kept going. This made J.N.M. sad, it did not feel good. J.N.M. said that the Juvenile was no longer her friend. J.N.M. next asserted that the Juvenile had used his hand to touch her private part underneath her clothing. He put his hand in her pants while they were outside. J.N.M. described this as happening when it was "his" birthday, and J.P.M. went to get a Dr. Pepper, and they went to hide. This felt "not good." The Juvenile kept doing this, and neither of them said anything. J.N.M. added that the Juvenile had caused her to touch his hip and breasts with her hand when he picked her up to spin her around. These activities occurred when they were in school and every day when they were out of school. The Juvenile took J.N.M. to the back yard to spin her.

During the interview, J.N.M. used drawings of a nude boy and a nude girl to specifically identify the body parts to which she referred.

Detective Robertson set up a second interview for J.N.M. with the Child Advocacy Center after being informed by L.B. that J.N.M. had, subsequent to the first interview, disclosed to her events not previously mentioned. However, the only new information provided to Ms. Simon by J.N.M. in that interview related to an additional incident wherein the juvenile had kissed J.N.M. on the arm. Additionally, J.N.M. did attempt to clarify the particulars of the incident wherein she claimed the juvenile had anally raped her. In this interview, J.N.M. told Ms. Simon that the sexual contact occurred underneath her clothing and not on the exterior of her underwear. She further particularized the offensive contact short of sexual contact by telling Ms. Simon that the juvenile had kissed her breasts, lips, arm, and braids. She also repeated her claim that the juvenile had used his hand to touch her "middle spot" and her "butt."

Detective Robertson testified that when she interviewed J.D.B., the juvenile denied all of the victim's allegations. He told Detective Robertson that recently he

5

and J.N.M. had begun to have problems and were not getting along. He did acknowledge that he may have touched the victim's buttocks on one occasion during a game of tackle football.

In opposition to the evidence presented by the state, the juvenile offered the testimony of a number of witnesses from the neighborhood, all of whom could only testify that they had not observed any of the incidents testified to by J.N.M. These witnesses included J.W., the juvenile's mother's fiancee, who lived with the family; M.A., who lived in the house between that of the victim and the juvenile; M.C., who lived across the street from the victim and the juvenile; and C.D., the juvenile's mother. The general consensus of these witnesses was that everything in the neighborhood appeared normal until around the time of the allegations. M.A. and C.D. alluded to an incident involving M.A.'s seven-year-old grandson as the possible cause of the animosity.

In rendering its judgment, the juvenile court gave the following reasons for acquitting the juvenile of the aggravated rape and indecent behavior with juvenile charges and for finding that he committed the offense of sexual battery:

> Very difficult, very emotional, very sensitive, very unfortunate that we're here. I try to pay close attention to all of the testimony, all of the evidence. I think that I've followed it well enough to make a decision, and I realize that the law requires that the State prove its case beyond all reasonable doubt. The reasonable doubt exists when the trier of fact is not firmly convinced of the truth of the charge. As to the aggravated rape, I find there's reasonable doubt. There was testimony from [the victim] that the clothes were on; they were off. At one point she said that he - [the Juvenile] pulled her pants down but not the underwear, so I'm just - I don't see there's penetration. There was [sic] questions about on or in the butt; I just don't think that penetration has been established. And also aggravated rape could occur by way of oral sex, [the Juvenile] touching her in her groin area with his mouth. There was - But as best I could tell, [the victim] is saying that occurred in the front yard while they were playing hide and seek. I think there's reasonable doubt as to that because I would agree with Ms. [W.], and I

6

know for certain that some people do things we don't understand and wouldn't make sense to us, but for - when you look at the bushes in the front yard, this is daytime in the front yard, those kids would be easily seen from anyone from the street or anywhere else in the front yard underneath those bushes as they existed in 2008. So, I don't think - I think there's reasonable doubt as to that.

Sexual battery, I find there's evidence to support an adjudication of sexual battery. [The victim]'s testimony was just very strong. She was consistent when she talked to her mom; she was consistent here in court; she was consistent in the CAC tape. The details may be a little off in some respects, but, again, she's six years old, and I just don't think that she could come up with such an elaborate fabrication at that age and at her current age. I realize that I don't - there was no testimony from any of the adults that put [the victim] and [the juvenile] together for any appreciable amount of time, but, that doesn't mean it didn't happen. These are offenses that occur without witnesses most of the time. I imagine there may be an instance or so where there is a witness, an unknown witness, or someone may be in a position to witness something where the offender didn't know it, or didn't care, I don't know, but generally speaking these - you don't have witnesses to these types of offenses. But I'm convinced that while her testimony may be somewhat disjointed, but not really, I'm not going to say to the point where I can't believe her, but I do believe that there was some improper touching about the breasts and around her buttocks.

Indecent behavior, I think - I'm gonna - I find that the sexual battery, I think that did occur, but it's by way of touching, and those things also could reasonably conclude - a person could reasonably conclude that they involved - that could be a basis for a conviction of indecent behavior. But I think there's a jeopardy issue here, there can't be both, it's either one or the other, and I find sexual battery by way of the touchings underneath the clothing, over - underneath and over, whatever, it may have been either, are enough to support a conviction of sexual battery, and that's what I find.

J.D.B. perfected this appeal, asserting in his one assignment of error that the evidence was insufficient to establish all of the elements of sexual battery beyond a reasonable doubt.

**OPINION**

Louisiana Children's Code Article 883 provides that "[i]n order for the court to adjudicate a child delinquent, the state must prove beyond a reasonable doubt that

7

the child committed a delinquent act alleged in the petition." That being the case, the state's burden of proof is the same as would be required in a criminal proceeding against an adult. *State ex rel. Tatom*, 463 So.2d 35 (La.App. 5 Cir. 1985). Our review of the sufficiency of the evidence in a delinquency adjudication is subject to the due process standards set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). *State ex rel. L.T.*, 99-487 (La.App. 3 Cir. 10/13/99), 747 So.2d 148. The Louisiana Supreme Court has discussed the due process standard for reviewing the sufficiency of evidence under *Jackson* and, in doing so, has stated the following:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (some citations omitted).

With regard to the offense of sexual battery, La.R.S. 14:43.1(A) provides:

> Sexual battery is the intentional engaging in any of the following acts with another person where the offender acts without the consent of the victim, or where the act is consensual but the other person, who is not the spouse of the offender, has not yet attained fifteen years of age and is at least three years younger than the offender:
>
> (1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender; or
>
> (2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.

Touching through clothing is sufficient to complete the touching element of sexual battery. *State v. Simpkins*, 44,197 (La.App. 2 Cir. 5/13/09), 12 So.3d 1021, *writ denied*, 09-1229 (La. 2/5/10), 27 So.3d 296, *and writ denied*, 09-1539 (La. 3/5/10), 28 So.3d 1004.

J.D.B. argues that because the only evidence tending to establish aggravated rape was provided by the victim and because the juvenile court concluded that the evidence was insufficient on this charge, the juvenile court implicitly found J.N.M.'s testimony to be inconsistent, self-contradictory, and unbelievable. That being the case, he argues, the juvenile court erred in not finding the victim's testimony concerning the sexual battery charge to be equally unreliable.

We do not find that the juvenile court found J.N.M.'s testimony to be unreliable. On the contrary, the juvenile court made the following statement with respect to the victim's reliability:

> [J.N.M.]'s testimony was just very strong. She was consistent when she talked to her mom; she was consistent here in court; she was consistent in the CAC tape. The details may be a little off in some respects, but again, she's six years old, and I just don't think that she could come up with such an elaborate fabrication at that age and at her current age. I realize that I don't - there was no testimony from any of the adults that put [J.N.M.] and [the Juvenile] together for any appreciable amount of time, but, that doesn't mean it didn't happen. These are offenses that occur without witnesses most of the time. I imagine there may be an instance or so where there is a witness, an unknown witness, or someone may be in a position to witness something where the offender didn't know it, or didn't care, I don't know, but generally speaking these - you don't have witnesses to these types of offenses. But I'm convinced that while her testimony may be somewhat disjointed, but not really, I'm not going to say to the point where I can't believe her[.]

In other words, the juvenile court did not conclude that J.N.M. was unreliable, but that the aggravated rape evidence lacked proof of an essential element of the offense—penetration. Additionally, the juvenile court rejected the indecent behavior

9

charge, not because the facts were not present to establish the offense, but because of double jeopardy concerns.

As noted in *Jackson*, 443 U.S. at 319 (footnote omitted), the reviewing court must review all the evidence presented at trial in order to determine the sufficiency of the evidence:

> This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all the evidence* is to be considered in the light most favorable to the prosecution.

When the evidence in this matter is viewed in the light most favorable to the state, the evidence establishes that the juvenile rubbed his bare genitals against the victim's anus, regardless of whether J.N.M.'s anus was covered by her underwear. It matters not whether the act was consensual because J.N.M. was more than three years younger than J.D.B. Thus, we find no error in the juvenile court's conclusion that the state had established the offense of sexual battery by proof beyond a reasonable doubt. We find no merit in this assignment of error.

Pursuant to La.Ch.Code art. 104, La.Code Crim.P. art. 920, and this court's holding in *State ex rel. J.C.G.*, 97-1044 (La.App. 3 Cir. 2/4/98), 706 So.2d 1081, we review all delinquency appeals for errors patent. In this matter, we find one such error that must be addressed.

The juvenile court failed to inform J.D.B. of the two-year prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Although the Louisiana Children's Code contains no similar provision, this court has previously held that this notice should be given. *State ex rel. J.C.G.*, 706 So.2d 1081; *State ex*

10

*rel. J. F.*, 03-321 (La.App. 3 Cir. 8/6/03), 851 So.2d 1282. Thus, the matter must be remanded to the juvenile court with instructions to advise J.D.B. of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof that J.D.B. received the notice. *See State ex rel. J.C.G.*, 706 So.2d 1081.

## DISPOSITION

We affirm J.D.B.'s adjudication of delinquency. We remand the matter with instructions to the juvenile court to advise J.D.B. of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to him within ten days of the rendition of this opinion and to file written proof that J.D.B. received the notice.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules–Courts of Appeal, Rule 2–16.3.